**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| CYVA RESEARCH HOLDINGS LLC,<br>Plaintiff,<br>v.<br>HOMEAWAY, INC. ET AL.,<br>Defendants. | Civil Action No. 2:14-cv-00471-JRG<br>LEAD CASE |
| CYVA RESEARCH HOLDINGS LLC,<br>Plaintiff,<br>v.<br>EBAY INC.,<br>Defendant. | Civil Action No. 2:14-cv-00637-JRG<br>JURY TRIAL DEMANDED |

**DEFENDANT EBAY INC.'S MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. UNDISPUTED FACTS ............................................................................................3

A. The '569 Patent And Claims ....................................................................3

B. Plaintiff's Infringement Allegations .........................................................6

C. Brokering Of Personal Information Is An Old (And Everyday) Concept ..............7

III. LEGAL STANDARDS ............................................................................................8

A. Whether A Claim Recites Patent-Eligible Subject Matter Is A Threshold Issue Of Law Appropriate For Early Resolution ..............................8

B. The Proper Framework For Determining Whether A Claim Recites Patent-Eligible Subject Matter ....................................10

C. A Drafter's Choice To Avoid "Process" Claims Does Not Shield CYVA's Patent Claims From Ineligibility ................................11

IV. THE '569 PATENT CLAIMS ARE NOT PATENT ELIGIBLE UNDER § 101............12

A. The '569 Patent Claims Are Directed To The Unpatentable Abstract Concept And Mental Process Of Using An Intermediary To Broker Exchange of Personal Information In A Transaction ..........................12

B. The '569 Patent's Claims To This Abstract Concept Fail The Particular-Machine-Or-Transformation Test..........................................19

C. The '569 Patent's Claims Fail To Add Anything Significant To This Abstract Concept ..................................................20

*1. "Computerizing" The Abstract Idea Of Using Intermediaries To Broker Information Exchange Is Not Sufficient* ...........21

*2. The Dependent Claims Do Not Add Significant Patentable Subject Matter* ......................................................24

V. CONCLUSION.........................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013)........................................ passim

*Alice Corp. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)........................................ passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................ 9

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012)........................................ 9, 10, 15, 23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................ 9

*Bilski v. Kappos*,
130 S. Ct. 3218 (2010)........................................ passim

*buySAFE Inc. v. Google Inc.*,
964 F. Supp. 2d 331 (D. Del. 2013)........................................ 15

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
No. 6:12-CV-674, 2014 WL 923280 (E.D. Tex. Jan. 21, 2014) (Davis, C.J.) .................. passim

*CLS Bank Int'l v. Alice Corp.*,
717 F.3d 1269 (Fed. Cir. 2013) (en banc) (plurality opinion),
*aff'd*, *Alice*, 134 S. Ct. 2347 (2014) ........................................ 13, 25

*Compression Tech. Solutions LLC v. EMC Corp.*,
No. C-12-01746 RMW, 2013 WL 2368039 (N.D. Cal. May 29, 2013).................................. 15

*Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*,
558 Fed. App'x 988 (Fed. Cir. 2014) (nonprecedential) ........................................ 9, 10, 15

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011)........................................ passim

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012)........................................ passim

*Diamond v. Diehr*,
450 U.S. 175 (1981)........................................ 21, 22

*DietGoal Innovations LLC v. Bravo Media LLC*,
No. 13 Civ. 8391, 2014 WL 3582914 (S.D.N.Y. July 8, 2014)........................................... 9, 12

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
No. 2013-1600, 2014 WL 3377201 (Fed. Cir. July 11, 2014)............................................ 9, 20

*Fort Props., Inc. v. Am. Master Lease LLC*,
671 F.3d 1317 (Fed. Cir. 2012)........................................................................................ 9, 15

*Gottschalk v. Benson*,
409 U.S. 63 (1972)........................................................................................................ 15, 20, 21

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) (*en banc*),
*aff'd*, *Bilski II*, 130 S. Ct. 3218 (2010)....................................................................... 3, 9, 10, 15

*In re Comiskey*,
554 F.3d 967 (Fed. Cir. 2009)............................................................................................ 15

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
984 F. Supp. 2d 189 (S.D.N.Y. 2013)................................................................................ passim

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 (2012)........................................................................................................ passim

*Parker v. Flook*,
437 U.S. 584 (1978)...................................................................................................... 22, 25, 27

*Planet Bingo, LLC v. VKGS, LLC*,
961 F. Supp. 2d 840 (W.D. Mich. 2013) ............................................................................ 15

*SmartGene, Inc. v. Advanced Biological Labs., SA*,
555 Fed. App'x 950 (Fed. Cir. 2014) (nonprecedential) .................................................. passim

*Smith v. Smith*,
154 F.R.D. 661 (N.D. Tex. 1994) ........................................................................................ 8

*UbiComm, LLC v. Zappos IP, Inc.*,
No. CV 13-1029-RGA, 2013 WL 6019203 (D. Del. Nov. 13, 2013)..................................... 8

*Uniloc USA, Inc. v. Rackspace Hosting, Inc.*,
No. 6:12-CV-375, 2013 WL 7393173 (E.D. Tex. Mar. 27, 2013) (Davis, C.J.).................. 9, 10

**Statutes**

35 U.S.C. § 101........................................................................................................... passim

**Other Authorities**

Brett L. Hopper, *The Selling Real Estate Broker and the Purchaser: Assessing the Relationship*, 1992 B.Y.U. L. Rev. 1135........................................... 7

Note, *Protecting Confidentiality in Mediation*, 98 Harv. L. Rev. 441, n.3 (1984)......................... 8

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................... 1, 8, 9, 28

Fed. R. Civ. P. 12(c) ............................................................................................... 1, 8, 9, 28

Defendant eBay Inc. ("eBay") respectfully requests that the Court dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(6) or grant judgment on the pleadings pursuant to Rule 12(c). As discussed herein, all of the claims of the patent asserted against eBay by Plaintiff CYVA Research Holdings, LLC ("Plaintiff" or "CYVA") are directed to subject matter that is ***not*** patentable under 35 U.S.C. § 101.

## I. INTRODUCTION

The claims of U.S. Patent No. 8,195,569 ("the '569 patent" or "the CYVA patent") are directed to mental steps and abstract ideas and are thus manifestly unpatentable. While 35 U.S.C. § 101 (hereafter, "§ 101") allows for a broad scope of patent-eligible subject matter, courts have long held that § 101 does not permit patenting of: (1) ***mental processes*** that can be performed in the human mind, or by the use of pen and paper; and (2) sweeping ***abstract ideas***. *E.g.*, *Bilski v. Kappos*, 130 S. Ct. 3218 (2010) ("*Bilski II*"); *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (noting that the Court has applied the "abstract idea" exception for more than 150 years).

At its core, the '569 patent claims nothing more than the abstract business concept of ***using intermediaries to broker exchanges of personal information***—thereby facilitating privacy and security while avoiding risk in transactions—something that people have done for decades (using, *e.g.*, escrow agents, real estate brokers). More specifically, the '569 patent essentially claims using computers to perform the abstract steps of "advertis[ing] one or more products or services for trade," "shop[ping] for the products and services," "send[ing] . . . personal information . . . and one or more rules governing processing of the . . . information," "storing product information," "processing . . . trade interactions between the [agents]," "maintaining the privacy and integrity of the [buyer and seller] information and rules," and "ensur[ing] the rules are satisfied before the trade interactions . . . are processed." These steps amount to no more than abstract concepts and mental processes that can be performed (and have been for decades at least) in the human mind or

with pen and paper, rendering the ’569 patent claims unpatentable intellectual concepts. Further, while the CYVA claims vaguely recite various unspecified “network” devices on which to implement this abstract mental process, they recite no new or special machine and no intricate programming. Instead, the patent claims no more than generic, general-purpose computers in a networking environment (namely, a “networked device,” a “database,” a “networked server,” and “one or more processors”) to perform the abstract process of brokering the exchange of personal information. The law requires more. CYVA’s patent should be held invalid.

A series of cases from the U.S. Supreme Court and the Federal Circuit over the past several years confirms that abstract ideas just like these are not patent eligible under § 101, even if coated in a veneer of “computer” or “Internet” implementation. For example, in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-77 (Fed. Cir. 2011), the Federal Circuit affirmed summary judgment of invalidity under § 101 of claims for a process of collecting and organizing data regarding credit card transactions using computers over the Internet. Perhaps most significantly, the Supreme Court this June unanimously affirmed that patent claims directed to a strikingly similar abstract concept—“exchanging financial obligations between two parties ***using a third party intermediary to mitigate settlement risk***”—were not patent eligible under § 101. *Alice*, 134 S. Ct. at 2356 (emphasis added). The Court held that “there [was] no meaningful distinction between the concept of risk hedging in *Bilski* and the concept of intermediated settlement,” and that “both are squarely within the realm of ‘***abstract ideas***.’” *Id.* at 2357 (emphasis added) (characterizing each of “risk hedging” and “intermediated settlement” as “a method of organizing human activity” and a “fundamental economic practice”). And, as in this case, Alice’s addition of basic computer concepts and components did not save the claims. CYVA’s claims are indistinguishable from Alice’s for purposes of § 101. Like these cases, and

numerous others, the claims in the CYVA patent are ineligible for a patent because they recite nothing but an abstract concept performed on general purpose computers over the Internet.

It is appropriate for this Court to address the validity of the ’569 patent under § 101 now, before this case progresses any further. Whether patent claims are “drawn to patent-eligible subject matter under § 101 is a threshold inquiry” and “an issue of law.” *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008) (*en banc*) (“*Bilski I*”), *aff’d*, *Bilski II*, 130 S. Ct. 3218 (2010); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1304 (2012) (“*Mayo*”) (rejecting argument that courts should defer § 101 challenges until after other defenses are decided).

## II. UNDISPUTED FACTS

### A. The ’569 Patent And Claims

The ’569 patent generally relates to a business method for managing the exchange of personal information performed with the help of generic computers. (*See* ’569 patent, 1:17-22.)[1] The patent describes computer software designed to run on a server and be accessible by computers across the Internet to form “Trusted Electronic Communities (E-Metro Communities),” or websites in which members may control what personal information is shared with other members through the use of rules enforced by an intermediary, the “E-Broker.” (*Id.* at 2:12-23, 2:39-42, 2:53-57.) The patent likens this “E-Metro Community” to a community within a physical metropolis, (*id.* at 4:45-50), in which people interact using an “electronic presence or digital persona” that the patent refers to as “an electronic personal information agent or E-PIA,” (*id.* at 10:11-30.) A participant’s E-PIA contains personal information about her, and this actual person can define rules to protect the privacy and dissemination of the information. (*Id.* at 12:42-56.)

[1] The ’569 patent is attached as Exhibit 1 to the Declaration of Philip Warrick filed in support of this motion (“Warrick Declaration”). For the Court’s convenience, eBay has compiled the claims into one document attached as Exhibit 2 to the Warrick Declaration.

The patent explains that this combination of E-PIAs (and a variant called E-AutoPIAs) and E-Brokers permits trusted commercial transactions between participants in the system:

> For example, if an E-PIA enters an E-Metro Community to find member who are interested in purchasing a car, the request is given to the E-Broker. The E-Broker, . . . then searches all the members to find those that have expressed an interest in purchasing a car and creates a list of all members meeting the necessary criteria. . . . [T]he E-Broker ***acts as an intermediary*** between the E-AutoPIA and the E-Metro Community E-PIAs. In the above example, even after the E-Broker has created the list of members that express an interest in purchasing a new car, the E-Broker still ***acts as a mediator***. The E-AutoPIA presents its rules for collecting information, and each member E-PIA presents its rules for disclosure, and the E-Broker ***determines what information, if any, will be exchanged***.

(*Id.* at 13:44-61 (emphases added).) It is precisely this type of broker-facilitated transaction to which the CYVA patent claims are directed.

While the ’569 patent is long on figures and words, the claims are directed to the basic concept of using a computerized “broker” or middleman to conduct a transaction between a seller and a buyer, ensuring that the parties’ personal information is disclosed pursuant to rules set down by the parties. The ’569 patent includes three substantially similar independent claims reciting either an “electronic bazaar operating on a distributed, electronic network” (claims 1 and 13) or a so-called “Beauregard claim,” *see CyberSource*, 654 F.3d at 1373, for a “computer-readable medium embodying a set of instructions executable by one or more processors” (claim 9). (’569 patent, 61:44-45, 63:15-16, 62:34-36.) Independent claim 1 is listed below for convenience:

| Claim 1 |
| --- |
| 1. An electronic bazaar operating on a distributed, electronic network, comprising:<br>an advertiser personal information agent (PIA), accessible to a seller by way of a networked device, configured to advertise one or more products or services for trade, the advertiser PIA also configured to send over the network one or more items of personal information regarding the seller and one or more rules governing processing of the seller's personal information items;<br>a buyer PIA, accessible to a buyer by way of a networked device, configured to shop for the products or services for trade, the buyer PIA also configured to send over the network one or more items of personal information regarding the buyer and one or more rules governing processing of the buyer’s personal information items; |

> a product database for storing product information concerning the products or services for trade, the product database being accessible to the buyer and advertiser PIAs; and
> an electronic broker computer program, residing on at least one networked server connected to the network, for providing trusted processing of one or more trade interactions between the buyer and advertiser PIAs where the trade interactions involve an exchange of personal information items between the buyer and advertiser PIAs, the electronic broker computer program including:
> means for maintaining the privacy and integrity of the personal information and rules provided by the buyer and advertiser PIAs, and
> means for allowing only a trusted process to securely access the personal information and rules from the buyer and advertiser PIAs to ensure that the rules are satisfied before the trade interactions for the products or services for trade are processed.

Claim 1 involves a combination of "personal information agents" or "PIAs" associated with a buyer and seller that, along with an "electronic broker computer program," purport to protect and facilitate the secure exchange of personal information of a buyer and seller in a "trade interaction" for "products or services." Claim 1 further recites a "product database" for storing product information accessible to these agents, and two "means for" clauses requiring the "electronic broker computer program" to protect the buyer's and seller's information and enforce the rules provided by the buyer and seller PIAs prior to the processing of a "trade interaction."

Claim 9 recites nearly identical elements, but is drafted in the form of "software code for" performing the same general functionality. (*Id.* at 62:34-63:3.) Claim 13 omits the "means" elements of claims 1 and 9 in favor of simply reciting that the "electronic broker program . . . ensur[es] that the rules governing the buyer's and seller's personal information items are satisfied before the trade transaction for the products or services are completed," and recites "clients" rather than "PIAs," and "transactions" instead of "interactions." (*Id.* at 63:15-64:7.)

The dependent claims fail to take the claims beyond an abstract concept. The additional elements of the dependent claims (numbered 2-8, 10-12, and 14-20) include:

- requiring "rules [to be] bound to and move across the network with the personal information items" (claims 2, 14)
- requiring "the advertiser and buyer PIAs" to "each securely encapsulate the advertiser and

buyer personal information and rules, respectively, in an encrypted format" (claims 3, 15)[2]

- "the electronic broker computer program permits transference of the advertiser PIA or buyer PIA to another PIA during an interaction, according to the rules" (claims 4, 16)
- including "a digital certificate for authentication" (claims 5, 10, 17)
- "[software code for] a trusted token processor configured to issue and validate trusted tokens presented by the buyer and advertiser PIAs" (claims 6, 11, 18)
- including "one or more transitive rules" (claims 7, 19)
- certifying "the trustworthiness of the buyer's and seller's personal information . . . by a third party" (claims 8, 12, 20)

According to the '569 patent, the improvement of the patent was converting this personal information broker concept to a networked computer environment. (*See id.* at 1:65-67 (stating that the prior art lacked an adequate "Internet utility or tool for the security and exchange of personal information").) The '569 patent, however, discloses very little, if anything, regarding the specifics of how the supposed invention is an effective tool over the long-existing business concept of using trusted intermediaries to reduce risk. Indeed, while the '569 patent discloses high-level discussion of software, it discloses no intricate computer programming or software by which the conventional computer helps to broker information exchange. Further, the '569 patent discloses general purpose computers and networks, not any specialized machine. For example, Figure 7 of the patent shows the "typical physical arrangement for the preferred embodiment" of the alleged invention. (*Id.* at 14:24-46 & Fig. 7.) But, neither Figure 7 nor any other part of the patent discloses any specific machines other than a basic "computer," "server," or "wireless devices," along with generic computer and network components, such as a "database."

### B. <u>Plaintiff's Infringement Allegations</u>

The abstract and mental nature of the '569 patent is illustrated by the breadth of the

[2] Dependent claims 15-18 recite various "PIAs," which lack proper antecedent basis in independent claim 13. For purposes of this motion, and without conceding the definiteness of the claims, eBay assumes that the "advertiser PIA" and "buyer PIA" recited in these dependent claims refer to the "advertiser client" and "buyer client" recited in claim 13, respectively.

allegations recited in Plaintiff's Complaint and in various additional lawsuits asserting the '569 patent. In essence, CYVA accuses a wide variety of websites merely because they serve as middlemen facilitating commerce between buyers and sellers on the Internet. For example, CYVA apparently accuses eBay's well-known website, "www.ebay.com and its auction services and related internal systems," of infringing the '569 patent because it serves as a third-party site where buyers and sellers can conduct transactions. (*See* Dkt. No. 1, ¶ 2.) CYVA has leveled similar allegations against numerous companies in the travel industry. For example, CYVA alleged that Hotwire and Priceline infringed by allowing travelers to book or bid on hotel rooms through those companies' websites (*see* Case Nos. 2:13-CV-874; 2:13-CV-732). Thus, CYVA's own assertions show the breadth of the abstract concept of the '569 patent. CYVA attempts to ensnare websites that simply provide intermediary services to broker the exchange of information related to transactions on the Internet.

### C. <u>Brokering Of Personal Information Is An Old (And Everyday) Concept</u>

At best, the '569 patent merely claims a computer implementation of the longstanding abstract concept of using intermediaries to broker information about two parties (such as a buyer and seller). Indeed, intermediary brokers have been performing this concept for ages in a number of contexts. For example, real estate brokers have for decades (at least) been able to represent both a buyer and a seller in a transaction (called a dual agency). *See, e.g.*, Brett L. Hopper, *The Selling Real Estate Broker and the Purchaser: Assessing the Relationship*, 1992 B.Y.U. L. Rev. 1135, 1143-44. In those situations, the broker receives personal information (*e.g.*, names) from both parties but only discloses it to the other party if certain rules are met (*e.g.*, when an offer is made or accepted). *See id.* at 1144 n.36 ("The agent . . . is under no duty to disclose, and has a duty not to disclose to one principal, confidential information given to him by the other, *such as the price he is willing to pay*." (citing Restatement (Second) of Agency §§ 256-264 (1958))).

Likewise, civil disputes have for at least decades been resolved through the services of mediators who engage in confidential conversations with both sides—often through attorneys or other representatives of the parties—and whose disclosure of any confidential information learned is subject to the express instructions of the disclosing party. *See, e.g.*, *Smith v. Smith*, 154 F.R.D. 661, 667 (N.D. Tex. 1994) ("Unless expressly authorized by the disclosing party, the impartial third party may not disclose to either party information given in confidence by the other and shall at all times maintain confidentiality with respect to communications relating to the subject matter of the dispute." (quoting Tex. Civ. Prac. & Rem. Code Ann. §§ 154.053(b) (West Supp. 1994))); Note, *Protecting Confidentiality in Mediation*, 98 Harv. L. Rev. 441, 441-46 & n.3 (1984) ("A promise of confidentiality is generally considered a prerequisite to mediation.").[3] Similar roles are played every day by trusted intermediaries ranging from matchmakers to executive headhunters.

## III. LEGAL STANDARDS

### A. Whether A Claim Recites Patent-Eligible Subject Matter Is A Threshold Issue Of Law Appropriate For Early Resolution

A complaint asserting patent claims that lack patent eligibility pursuant to § 101 may properly be dismissed pursuant to Rule 12(b)(6) or 12(c), particularly in cases like this where "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility the patent must be invalidated at the pleading stage." *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 984 F. Supp. 2d 189, 204 (S.D.N.Y. 2013) (internal quotation omitted) (granting judgment on the pleadings); *see also UbiComm, LLC v. Zappos IP, Inc.*, No. CV 13-

[3] The references cited regarding the roles of real estate agents and mediators are available on Westlaw and, for the Court's convenience, are also compiled in Warrick Declaration Exhibit 3.

1029-RGA, 2013 WL 6019203, at *6 (D. Del. Nov. 13, 2013) (granting motion to dismiss).[4] Indeed, a court in this District has recently granted motions under both Rule 12(c) and Rule 12(b)(6) dismissing complaints for failure to allege infringement of a patentable claim under 35 U.S.C. § 101. *See Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, No. 6:12-CV-674, 2014 WL 923280, at *4-5 (E.D. Tex. Jan. 21, 2014) (Davis, C.J.); *Uniloc USA, Inc. v. Rackspace Hosting, Inc.*, No. 6:12-CV-375, 2013 WL 7393173, at *5 (E.D. Tex. Mar. 27, 2013) (Davis, C.J.).

As the court explained in the *Uniloc* case, a complaint must "state a plausible claim for relief" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "When the allegation in a complaint, however true, could not raise an entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1216, at 233-34).

More specifically, "[w]hether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law," *Bilski I*, 545 F.3d at 951, and, thus, appropriate for early resolution by the Court,[5] and "Section 101 questions of patentability may be resolved before claim construction,"

---

[4] For the Court's convenience, a copy of each Westlaw-reported case cited in this brief is compiled in Exhibit 4 to the Warrick Declaration.

[5] *See, e.g., Uniloc*, 2013 WL 7393173, at *5 (granting motion to dismiss); *see also DietGoal Innovations LLC v. Bravo Media LLC*, No. 13 Civ. 8391, 2014 WL 3582914, at *1 n.1 (S.D.N.Y. July 8, 2014) (granting motions for summary judgment and noting they "could equally validly have been styled motions for judgment on the pleadings"); *cf. Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336 (Fed. Cir. 2013) (affirming summary judgment); *Alice*, 134 S. Ct. 2347; *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, No. 2013-1600, 2014 WL 3377201 (Fed. Cir. July 11, 2014); *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012); *Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317 (Fed. Cir. 2012); *CyberSource*, 654 F.3d 1366; *Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*, 558 Fed. App'x 988 (Fed. Cir. 2014) (nonprecedential); *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 Fed. App'x 950 (Fed. Cir. 2014) (nonprecedential).

*Uniloc*, 2013 WL 7393173, at *1 (citing *Bancorp*, 687 F.3d at 1273–74 (affirming invalidation of a patent under 35 U.S.C. § 101 without claim construction)). Acknowledging these principles, courts have frequently resolved §101 questions prior to resolving claim construction disputes. *See, e.g.*, *id.* at *5 (granting motion to dismiss); *Clear with Computers*, 2014 WL 923280, at *4 (granting judgment on the pleadings and—solely for purposes of resolving the underlying motion—adopting plaintiff's construction of the only disputed term relevant to the §101 analysis).[6] Additionally, patent-eligibility is a "threshold issue" to be decided early, regardless of whether the claims may be invalid for failing to meet other requirements for patentability. *Bilski I*, 545 F.3d at 950. There is no reason to defer a decision on patent eligibility under § 101 until later in the process, as neither discovery nor claim construction will affect the issue.

### B. The Proper Framework For Determining Whether A Claim Recites Patent-Eligible Subject Matter

Section 101 provides that patentable subject matter extends to "new and useful process[es], machine[s], manufacture, or composition[s] of matter." 35 U.S.C. § 101. In *Mayo*, however, the Supreme Court reiterated that its precedents carve out several broad categories of subject matter that are ***not*** eligible for patent protection under §101: "Phenomena of nature, … ***mental processes***, and ***abstract intellectual concepts*** are not patentable, as they are the basic tools of scientific and technological work." *Mayo*, 132 S. Ct. at 1293 (emphasis added) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)); *see also Bilski II*, 130 S. Ct. at 3221 ("The concepts covered by these exceptions are part of the storehouse of knowledge of all men . . . free

[6] *See also Bilski I*, 545 F.3d at 951 (deciding issue without claim construction because "there is no claim construction dispute in this appeal"); *Cyberfone*, 558 Fed. App'x at 991 n.1 (finding "no requirement that the district court engage in claim construction before deciding §101 eligibility"); *Bancorp*, 687 F.3d at 1273 (agreeing that "claim construction is not an inviolable prerequisite to a validity determination under § 101"); *Lumen View*, 984 F. Supp. 2d at 205 (granting judgment on the pleadings and finding claim construction unnecessary to decide the §101 issue).

to all men and reserved exclusively to none." (quotation omitted)).

In several recent § 101 decisions, the Supreme Court has provided a general framework for courts to use in deciding patent eligibility. In *Alice*, the Supreme Court reconfirmed that this framework—previously set forth in *Mayo*, which related to the prohibition on natural laws—equally applies to determining whether a patent is ineligible for claiming an abstract concept:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.

*Alice*, 134 S. Ct. at 2355 (internal citations omitted) (quoting *Mayo*, 132 S. Ct. at 1296-98). For claims found to be directed to ineligible concepts, the second question becomes whether the patent claims "do significantly more than simply describe" that mental process, abstract idea, or law of nature, *Mayo*, 132 S. Ct. at 1297, which the Supreme Court has also described as "a search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294); *see also SmartGene*, 555 Fed. App'x at 955 ("[W]hen a claim involves an abstract idea . . . , eligibility under section 101 requires that the claim involve 'enough' else—applying the idea in the realm of tangible physical objects (for product claims) or physical actions (for process claims)—that is beyond 'well-understood, routine, conventional activity.'" (quoting *Mayo*, 132 S. Ct. at 1294, 1298, 1299)).

### C. A Drafter's Choice To Avoid "Process" Claims Does Not Shield CYVA's Patent Claims From Ineligibility

While the CYVA patent nominally claims either a "computer-readable medium embodying a set of instructions executable by one or more processors" (claim 9) or an "electronic bazaar [comprising computer program(s)] operating on a distributed, electronic network" (claims 1 and

13), this does not confer presumptive eligibility.  In fact, CYVA's claims of the '569 patent are primarily directed to the abstract and mental steps associated with using intermediaries (i.e., "agents" or "PIAs" and "an electronic broker") to facilitate exchange of personal information in a commercial transaction.  As outlined previously in the Introduction, *supra*, and as illustrated in the Table in Section IV.A, *infra*, the claims essentially recite thinly veiled method steps (e.g., shopping, sending information, processing transactions) only technically drafted to comply with other statutory classifications of a "system" or "manufacture."  As such, it is not only instructive, but also appropriate to consider the CYVA claims against tests for patent-eligible processes.  *See, e.g.*, *DietGoal*, 2014 WL 3582914, at *9 n.5 ("'Regardless of what statutory category ("process, machine, manufacture, or composition of matter," 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes.'" (quoting *CyberSource*, 654 F.3d at 1374)).  For example, in *Alice*, the Supreme Court noted that it "has long 'warn[ed] . . . against' interpreting § 101 'in ways that make patent eligibility depend simply on the draftsman's art,'" 134 S. Ct. at 2360 (quoting *Mayo*, 132 S. Ct. at 1294 (citation omitted)), and held that the asserted "claims to a computer system and a computer-readable medium fail for substantially the same reasons" as the ineligible method claims.  *Id.*

## IV.     THE '569 PATENT CLAIMS ARE NOT PATENT ELIGIBLE UNDER § 101

### A.     The '569 Patent Claims Are Directed To The Unpatentable Abstract Concept And Mental Process Of Using An Intermediary To Broker Exchange of Personal Information In A Transaction

CYVA's '569 patent claims nothing but the unpatentable abstract concept of using a trusted broker to facilitate privacy of personal information during a commercial transaction, in other words, having a broker follow the parties' requests to keep their personal information private until certain conditions are met.  Such a concept has been performed by numerous types of brokers and intermediaries for decades at least, including real estate brokers, matchmakers, mediators, and

others. Numerous recent cases from the Supreme Court and Federal Circuit show why claims to such basic commercial concepts, even if "computerized," are not patentable under § 101.

***Alice***: The Supreme Court in *Alice* unanimously confirmed the long line of Federal Circuit cases holding that merely implementing on a computer basic concepts that humans have performed for some time is not patentable. Moreover, the claims of the Alice Corp. patent are strikingly similar to those here, claiming a computer-implemented method and system for "for mitigating 'settlement risk' (*i.e.*, the risk that only one party to a financial transaction will pay what it owes) by using a third-party intermediary." *Alice*, 134 S. Ct. at 2351-52. In the *Alice* claims, as here, a computer system served as the third-party intermediary, and the exemplary claim was quite long, taking up nearly half a page of the opinion. *See id*. at 2353 & n. 2. And like the CYVA patent, the claims expressly recited various generic computer components, including a "data processing system" with a "communications controller" and "data storage unit." *Id*. at 2360. Sitting *en banc*, the Federal Circuit confirmed a panel decision affirming summary judgment that the claims were drawn to "the abstract idea of reducing settlement risk by effecting trades through a third-party intermediary . . . empowered to verify that both parties can fulfill their obligations before allowing the exchange—i.e., a form of escrow." *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (en banc) (plurality opinion), *aff'd*, *Alice*, 134 S. Ct. 2347 (2014). The unanimous Supreme Court affirmed the plurality's decision, holding every computer-implemented claim in Alice Corp.'s patent ineligible under § 101, including both system and method claims.

***Bilski***: In *Bilski*, the claims recited a series of transactions between buyers and sellers of commodities in the energy market, at different fixed rates, to protect or hedge against the risk of price changes. 130 S. Ct. at 3223-24. The Supreme Court reasoned that the claims merely

explained the basic concept of hedging, which "is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class." *Id.* at 3231. This concept was not eligible for a patent, because patenting an abstract concept even for a specific field of use is not sufficient to escape the prohibition of § 101. *Id*.

***Accenture***: Following *Bilski*, the Federal Circuit has held that many other basic concepts of business or personal life are not patentable. In *Accenture*, the court held that § 101 precluded claims to a "system for generating tasks to be performed in an insurance organization," including "a computerized database of tasks, a means to allow a client to access those tasks, and a set of rules that are applied to that task on a given event." Of course, as is generally the case, the claims appeared more detailed than the concept itself, including numerous generic computer components such as "an insurance transaction database, a task library database, a client component for accessing the insurance transaction database, and a server component that interacts with the software components and controls an event processor, which watches for events and sends alerts to a task engine that determines the next tasks to be completed." *Id*. at 1338. Nonetheless, the Court held that, in essence, the claims encompassed nothing more the abstract idea of "generating tasks [based on] rules . . . to be completed upon the occurrence of an event." *Id*. at 1344.

***Lumen View***: Applying these same principles resulted in finding as an unpatentable abstract concept claims directed to yet another intermediary—a "method of matchmaking whereby one or more parties on each side input attribute preferences and intensity of preference data and then a computer matches the parties on each side by a 'closeness-of-fit' process and produces a list." *Lumen View*, 984 F. Supp. 2d at 192. The court held that the patent claimed "the idea of bilateral and multilateral matchmaking using a computer in the context of a financial transaction or an enterprise," which was "preemptive in the broadest sense" and was something that

"[m]atchmakers have been doing . . . for millennia." *Id*. at 198, 200.[7]

The Supreme Court has held that, just like an abstract concept, a ***mental process*** is also not eligible for patenting. *Mayo*, 132 S. Ct. at 1293.[8] Mental processes are also not eligible for patent protection because the "application of [only] human intelligence to the solution of practical problems is no more than a claim to a fundamental principle." *Bilski I*, 545 F.3d at 965. Following the Supreme Court's lead, the Federal Circuit has consistently "refused to find processes patentable when they merely claimed a mental process standing alone and untied to another category of statutory subject matter even when a practical application was claimed." *In re Comiskey*, 554 F.3d 967, 980 (Fed. Cir. 2009). Thus, "computational methods which can be performed *entirely* in the human mind are the types of methods that embody the basic tools of scientific and technological work that are free to all men and reserved exclusively to none." *CyberSource*, 654 F.3d at 1373 (emphasis in original). The following cases are instructive:

***CyberSource***: The patent in *CyberSource* encompassed a method for "verifying the

[7] *See also Bancorp*, 687 F.3d at 1269, 1272, 1277-81 (affirming ineligibility of systems and methods for administering and tracking the value of life insurance policies implemented on a computer using a "policy generator," a "fee calculator," a "credit calculator," and a "digital storage"); *Cyberfone*, 558 Fed. App'x at 991-93 (using a computer to collect, sort, and forward transaction data); *Fort Props.*, 671 F.3d at 1318, 1322–23 ("creating a real estate investment instrument" by aggregating real property and using a computer to "generate a plurality of deedshares"); *Dealertrack*, 674 F.3d at 1330-34 (computer-aided method and system for processing credit applications over electronic networks); *buySAFE Inc. v. Google Inc.*, 964 F. Supp. 2d 331, 337 (D. Del. 2013) (computerized "process of underwriting commercial transactions by a third party to guarantee performance"); *Planet Bingo, LLC v. VKGS, LLC*, 961 F. Supp. 2d 840, 850 (W.D. Mich. 2013) (computerized method of playing bingo); *Compression Tech. Solutions LLC v. EMC Corp.*, No. C-12-01746 RMW, 2013 WL 2368039, at *6-8 (N.D. Cal. May 29, 2013) (computerized method of context-insensitive parsing of information packets), *aff'd without opinion*, 557 Fed. App'x 1001 (Fed. Cir. 2014).

[8] Some cases, such as *Mayo* and *Benson*, suggest that mental processes may be a separate category of unpatentable subject matter, while other cases categorize mental processes as a "subcategory" of forbidden abstract concepts. *See, e.g.*, *CyberSource*, 654 F.3d at 1371. Regardless of classification, it is clear that mental processes are patent-<u>in</u>eligible under § 101.

validity of credit card transactions over the Internet" by "a) obtaining information about other transactions that have utilized an Internet address that is identified with the [ ] credit card transaction; b) constructing a map of credit card numbers based upon the other transactions and; c) utilizing the map of credit card numbers to determine if the credit card transaction is valid." *Id*. at 1368 n.1. Some claims expressly required that this method be carried out by a computer through "execution of the program instructions by one or more processors of a computer system." *Id*. The court held that the claims were not patentable because they could "be performed in the human mind, or by a human using a pen and paper." *Id*. at 1372. Allowing such a patent on a mental process would allow someone "to patent the use of human intelligence in and of itself." *Id*. Moreover, "merely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer" is not enough to satisfy § 101. *Id*. at 1375.

***SmartGene***: In *SmartGene*, the Federal Circuit explained that "section 101 [does] not embrace a process defined simply as using a computer to perform a series of mental steps that people, aware of each step, can and regularly do perform in their heads." 555 Fed. App'x at 954 (citations omitted). There, the Court found invalid claims to "a method, a system, and a computer program, respectively, for guiding the selection of a treatment regimen for a patient with a known disease or medical condition." *Id*. at 951. The Court affirmed summary judgment because the claims "no more than call on a 'computing device,' with basic functionality for comparing stored and input data and rules, to do what doctors do routinely." *Id*. at 954. "[E]very step is a familiar part of the conscious process that doctors can and do perform in their heads." *Id*. at 955.

Like all of these cases discussed above,[9] the '569 patent claims encompass a fundamental,

---

[9] For the Court's convenience, Exhibit 5 of the Warrick Declaration compiles exemplary patent claims held to be ineligible under § 101 in these recent cases.

abstract concept that human beings have been doing for a very long time: using intermediaries (e.g., escrow agents, real estate brokers) to broker secure exchanges of private information in connection with commercial transactions. The ’569 patent claims encompass this entire idea of using intermediaries to facilitate secure exchange of personal information in transactions.

More fundamentally, the CYVA patent claims relate to the more general abstract concept of relying on a trusted intermediary to minimize the risk of exchanging items of value between untrusted parties. The Supreme Court has already expressly and unanimously rejected the patent eligibility of claims “designed to facilitate the exchange of ***financial obligations*** between two parties by using a computer system as a third-party intermediary.” *Alice*, 134 S. Ct. at 2352 (emphasis added). Why should the use of an intermediary to exchange ***intangible information*** be treated any differently under § 101? Indeed, these types of patent claims have fared particularly poorly in the courts due to the longstanding practice of using intermediaries as “a method of organizing human activity” as well as a “fundamental economic practice long prevalent in our system of commerce.” *Id.* at 2356; *see, e.g.*, *Dealertrack*, 674 F.3d at 1333 (“Neither Dealertrack nor any other entity is entitled to wholly preempt the clearinghouse concept.”); *CyberSource*, 654 F.3d at 1367 (finding ineligible “method and system for detecting fraud in a credit card transaction between [a] consumer and a merchant over the Internet”); *Lumen View*, 984 F. Supp. 2d at 192 (rejecting patent eligibility for “method of matchmaking whereby one or more parties on each side input attribute preferences . . . and then a computer matches the parties on each side”).

Many people have utilized the functionality of claims 1, 9, and 13 without requiring a computer of any sort. For example, in most states, a single real estate broker may represent both buyer and seller, but must maintain confidentiality of each of her client’s personal information, only disclosing that information with permission or when certain conditions are met, such as when

the buyer makes an offer or the seller accepts. *See* Section II.C, *supra*. In sum, the actions recited in the CYVA claims reflect simple everyday activities practiced daily across the globe.

A copy of claim 13 has been reproduced below, annotated to illustrate the mental steps and abstract concepts lurking behind the "system" statutory classification. As seen below, the red underlined text simply requires (1) a seller to advertise a product or service; (2) a buyer to shop for that product or service; (3) agents for each of the buyer and seller to transmit personal information regarding the buyer and seller, as well as rules for protecting that information; (4) storing product information; (5) a broker serving as an intermediary for a transaction between the agents for the buyer and seller; and (6) the broker ensuring that the agent rules protecting their clients' information are processed properly prior to the completion of the transaction. Much like the claims recently held invalid by Chief Judge Davis, these steps could be performed by humans "armed with only a pencil and paper." *Clear with Computers*, 2014 WL 923280, at *6 ("mental process of inventory-based selling" ineligible). So understood, claims 1, 9, and 13 are thus manifestly ineligible under § 101 because they encompass an abstract concept and mental process.

13. An electronic bazaar operating on a distributed, electronic network, comprising:
an advertiser client, executing on a networked device, for advertising one or more products or services for trade, the advertiser client configured to send over the network one or more items of personal information regarding a seller and one or more rules governing processing of the seller's personal information items;
a buyer client, executing on a networked device, for shopping for the products or services for trade, the buyer client configured to send over the network one or more items of personal information regarding a buyer and one or more rules governing processing of the buyer's personal information items;
a product database for storing product information concerning the products or services for trade, the product database being accessible to the buyer and advertiser clients; and
an electronic broker computer program, residing on at least one networked server connected to the network, for providing trusted processing of one or more trade transactions between the buyer and advertiser clients, and for ensuring that the rules governing the buyer's and seller's personal information items are satisfied before the trade transactions for the products or services are completed.

Like claim 13, independent claims 1 and 9 of the '569 patent describe nothing more than

conventional business decisions and procedures routinely performed by anyone utilizing escrow-type services in commercial or financial transactions to mitigate risk and ensure confidentiality. All CYVA's patent has done is taken these mental steps and abstract concepts and applied them in the context of generic "computer networks" including the Internet. The claims of the '569 patent to the abstract concept of using intermediaries to broker information exchange are no more eligible for a patent than those for using a third-party intermediary to mitigate settlement risk (*Alice*), hedging risk in the energy market (*Bilski*), gathering and sorting transaction information over a network (*Cyberfone*), verifying credit card transactions over the Internet (*CyberSource*), applying for credit over the Internet (*Dealertrack*), or managing insurance agency tasks (*Accenture*).

### B. The '569 Patent's Claims To This Abstract Concept Fail The Particular-Machine-Or-Transformation Test

While "not the sole test" for determining patent eligibility under § 101, the Supreme Court has acknowledged that "the machine-or-transformation test is a useful and important clue, an investigative tool." *Bilski II*, 130 S. Ct. at 3227. This test asks whether a claimed method "(1) [is] tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Id.* at 3225. CVYA's claims fail both prongs of this "important clue."

The '569 claims fail the first prong because none ties the claimed functionality to a particular machine. Despite including 64 columns of text and 34 figures, CYVA's patent fails to disclose—much less claim—any *particular* machine. As explained further in Section IV.C, *infra*, the specification teaches that the alleged "invention is a software system for operating on network servers," ('569 patent, 2:12-13, 2:15-18), but describes no specific machines and describes only "the Internet" as an exemplary "network." (*Id.* at 1:19-23.) The claims recite generic "network servers" and "network devices," but nothing in the specification indicates that these are anything other than general-purpose computers. (*E.g.*, *id.* at 2:12:-15 ("individual user's personal computer

system").) The "network server," for example, is never described with any greater specificity than those two words. The specification does reference a "hardware token or secure card security system," but only as an "optional" system not recited in any claim. (*See id.* at 4:38-40.)

The CYVA claims also fail to recite a "particular transformation." As noted in the specification, the alleged invention "relates to the software management of information." (*Id.* at 1:17-23; *see also id.* at 2:15-18 ("This invention is directed to a system for allowing . . . an entity to protect, command, control, and process information . . . .").) Indeed, the claims recite elements related to information processing, including, e.g., sending information over the network, storing information in a database, and maintaining the privacy and integrity of information. As in *Benson*, however, these claims at most transform numbers (i.e., digitally-stored information) from one form to another and thus fail the second prong of this "important clue" of patent eligibility. *See Clear with Computers*, 2014 WL 923280, at *6 ("[M]ere manipulation or reorganization of data . . . does not satisfy the transformation prong." (quoting *Cybersource*, 654 F.3d at 1375)); *Digitech*, 2014 WL 3377201, at *5 (affirming summary judgment where claims recited "a process of taking two data sets and combining them into a single data set"). While not necessarily dispositive, this machine-or-transformation analysis serves only to bolster the abstract nature of the CYVA claims.

### C. The '569 Patent's Claims Fail To Add Anything Significant To This Abstract Concept

Because the claims of the '569 patent clearly attempt to monopolize the abstract idea of using intermediaries to broker secure information exchange, CYVA must—but cannot—show that its claims "do significantly more than simply describe" that abstract idea. *Mayo*, 132 S. Ct. at 1297. In other words, to survive the second step of the *Mayo* framework confirmed in *Alice*, CYVA's claims must contain "additional substantive limitations [that] narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea

itself." *Accenture*, 728 F.3d at 1341 (citation omitted); *see also Clear with Computers*, 2014 WL 923280, at *3. "[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300.

#### ***1. "Computerizing" The Abstract Idea Of Using Intermediaries To Broker Information Exchange Is Not Sufficient***

Neither generic "networked devices," an "electronic network," nor a "database" establish the required "additional substantive limitations [that] narrow, confine, or otherwise tie down" the claims, *Accenture*, 728 F.3d at 1341. After all, "if that were the end of the § 101 inquiry, an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept." *Alice*, 134 S. Ct. at 2359; *see also Lumen View*, 984 F. Supp. 2d at 200 (noting that "all of the process patents invalidated in *Benson, Flook, Bilski*, and *Alice* were implemented by a computer"). Nothing could be clearer after the last few years of § 101 decisions that recitation of a computer and generic computer concepts, such as a "database," "server," or "network," are ***not*** enough to transform claims from an abstract idea or mental process into patent eligible ones.

Long ago, the Supreme Court noted that the abstract ideas exception "cannot be circumvented by attempting to limit the use of the [idea] to a particular technological environment." *Diamond v. Diehr*, 450 U.S. 175, 191 (1981); *accord Mayo*, 132 S. Ct. at 1294, 1298; *Bilski II*, 130 S. Ct. at 3230. And in *Benson*, the Supreme Court found that an algorithm capable of converting binary-coded decimal numerals into pure binary code was an unpatentable abstract idea and mental process even though the algorithm had "no substantial practical application except in connection with a digital computer." 409 U.S. at 64-67, 71-72.

The *Alice* decision built on these earlier cases and clarified that adding "generic computer implementation fail[s] to transform [an] abstract idea into a patent eligible invention." 134 S. Ct.

at 2357.  The Court noted that "the computer implementation [in *Benson*] did not supply the necessary inventive concept; the process could be 'carried out in existing computers long in use.'" *Id*. (citation omitted).  Likewise, the Court described its *Flook* case as standing "for the proposition that the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment."  *Id*. at 2358 (citation omitted).  In contrast, the Court distinguished its decision in *Diehr*, in which a patent was directed to a technological process of curing rubber in an industrial mold.  The claims were patent-eligible "not because [they] involved a computer," but because they "improved an existing technological process."  *Id*.  In sum, the Court held that "[g]iven the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'"  *Alice*, 134 S. Ct. at 2358 (quoting *Mayo*, 132 S. Ct. at 1297).

Following these same principles, the Federal Circuit has repeatedly confirmed that the use of a "computer to perform [a] mental process … does not impose a sufficiently meaningful limit on the claim's scope."  *CyberSource*, 654 F.3d at 1376 (affirming summary judgment that claims to a computerized method for verifying credit card information over the Internet failed § 101). Likewise, in *Dealertrack*, the court agreed that a method for processing credit applications over electronic networks was not patentable just because it was claimed as computerized:  "Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."  *Dealertrack*, 674 F.3d at 1333.

Furthermore, reciting generic components of a computer network, such as a database, networked device, or server, is no better than reciting just a "computer" because such components are merely the "physical components for input, memory, look-up, comparison, and output" of

"existing computers long in use," not "new machinery." *SmartGene*, 555 Fed. App'x at 955. In *Alice*, for example, the Court confirmed this line of precedent by holding that:

> [W]hat petitioner characterizes as specific hardware—a "data processing system" with a "communications controller" and "data storage unit," for example—is purely functional and generic. Nearly every computer will include a "communications controller" and "data storage unit" capable of performing the basic calculation, storage, and transmission functions required by the method claims. As a result, none of the hardware recited by the system claims offers a meaningful limitation beyond generally linking the use of the [method] to a particular technological environment, that is, implementation via computers.

*Alice*, 134 S. Ct. at 2360 (internal citations and quotation marks omitted). The following generic components have also been held insufficient to save claims in other cases from § 101 ineligibility:

- *Accenture* ("insurance transaction database," a "task library database," a "client component," a "server component," and an "event processor"), 728 F.3d at 1338-39;
- *Bancorp* ("policy generator," "calculators," and "digital storage"), 687 F.3d at 1271;
- *Dealertrack* ("computer," "central processor," "application entry and display device," "communications medium," and "terminal device"), 674 F.3d at 1319;
- *Lumen View* ("digital storage medium," "remote server," and "communication network"), 984 F. Supp. 2d at 191-93; and
- *Clear with Computers* ("user interface," "server" computer, "client" computer, and communication "via the Internet"), 2014 WL 923280, at *7.

Likewise, the '569 patent claims generically recite nothing more specific than a "network," a "networked device," a "networked server," and a "database" (for storing information), as well non-structural computer-related language like "configured," "electronic," and "computer program." These terms add nothing more than a generic computer and some components that are present in virtually every computer network; they fail to provide "meaningful" limits or "enough" of significance to go beyond the abstract concept and mental process. Disregarding this language, as illustrated in a marked-up version of claim 13 below, demonstrates the breadth and abstractness of the concept claimed, which leaves steps that a human can perform, either mentally or with pen and paper. *See Clear with Computers*, 2014 WL 923280, at *5 (similarly marking up an asserted patent claim by substituting "by a human" for "configuration of a computer system").

13. A~~n electronic~~ bazaar ~~operating on a distributed, electronic network~~, comprising:

an advertiser client, ~~executing on a networked device, for~~ advertising one or more products or services for trade, the advertiser client ~~configured to~~ sending ~~over the network~~ one or more items of personal information regarding a seller and one or more rules governing processing of the seller's personal information items;

a buyer client, ~~executing on a networked device, for~~ shopping for the products or services for trade, the buyer client ~~configured to~~ sending ~~over the network~~ one or more items of personal information regarding a buyer and one or more rules governing processing of the buyer's personal information items;

a product list ~~database~~ for storing product information concerning the products or services for trade, the product list ~~database~~ being accessed by ~~ible to~~ the buyer and advertiser clients; and

a~~n electronic~~ broker ~~computer program, residing on at least one networked server connected to the network, for~~ providing trusted processing of one or more trade transactions between the buyer and advertiser clients, and ~~for~~ ensuring that the rules governing the buyer's and seller's personal information items are satisfied before the trade transactions for the products or services are completed.

### *2. The Dependent Claims Do Not Add Significant Patentable Subject Matter*

The dependent claims of the ’569 patent likewise fail to go beyond the abstract idea and mental concept set forth in independent claims 1, 9, and 13. In particular, each of the dependent claims is equally unpatentable for one or more of the following reasons.

***Mental/Abstract Concepts***: Many of the dependent claims simply recite additional mental steps and/or abstract ideas. For example, claims 2 and 14 simply require “rules [to be] bound to and move across the network with the personal information items,” claims 4 and 16 permit “transference of [one] PIA to another PIA during an interaction, according to the rules,” and claims 7 and 19 require the inclusion of “one or more transitive rules.” Each of these elements directly relates to the overwhelmingly abstract and purely mental concept of ensuring privacy of personal information during a transaction. *See, e.g.*, *Accenture*, 728 F.3d at 1338-39 (holding that § 101 precluded claims to a “system for generating tasks to be performed,” including “a computerized database of tasks,” and “a set of rules that are applied to that task on a given event”). Similarly, claims 8, 12, and 20, which require certifying “the trustworthiness of the buyer’s and

seller's personal information . . . by a third party" represents yet another well-established and "fundamental economic practice," *Alice*, 134 S. Ct. at 2356, practiced long before the dawn of computers. Because the limitations of these dependent claims are abstract and can be performed without the need for computers, just like the steps of the independent claims, each fails to transform the claim into something patentable under § 101. *See CyberSource*, 654 F.3d at 1373; *SmartGene*, 555 Fed. App'x at 955; *Lumen View*, 984 F. Supp. 2d at 204 (finding dependent claims equally ineligible because they merely recited additional abstract ideas).

***Insignificant Pre-Solution and Post-Solution Activity***: The Supreme Court has held that "[t]he notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance," *Parker v. Flook*, 437 U.S. 584 (1978), and has expanded this principle to include activity both before and after the abstract process at issue, *see Mayo*, 132 S. Ct. at 1297-98, 1300-01 (noting that neither "pre-solution" nor "post-solution" activity impart patentability to an otherwise ineligible claim). A claim is not meaningfully limited "if it contains only insignificant or token pre- or post-solution activity—such as identifying a relevant audience, a category of use, field of use, or technological environment." *CLS Bank*, 717 F.3d at 1300-01. Data gathering or input steps are "pre-solution" activity that cannot save a claim under § 101: "Even if some physical steps are required to obtain information from the database (*e.g.*, entering a query via a keyboard, clicking a mouse), such data-gathering steps cannot alone confer patentability." *CyberSource*, 654 F.3d at 1372 (citation omitted). Further, transmitting information through the Internet is insignificant "post-solution" activity. *See, e.g.*, *Clear with Computers*, 2014 WL 923280, at *7 ("presenting a list . . . through the internet, is a token post-solution activity that does not meaningfully limit the abstract idea").

CYVA's dependent claims are also unpatentable because they involve insignificant and conventional pre-solution and post-solution activity surrounding the intermediary-based

information brokering process. For example, claims 3 and 15 involve the conventional post-solution activity of generic encrypting of information. These claims do not purport to improve the functioning of any given computer and are not drawn to particular encryption systems or methods. *See Alice*, 134 S. Ct. at 2351. Rather, dependent claims 3 and 15 recite only a generic "encrypted format," which the specification reveals to be neither a new format nor limited to any particular format(s). (*See* '569 patent, 8:60-9:4 (explaining that the "preferred embodiment uses the public-key cryptography techniques supplied by RSA Data Security, Inc.," described as "one method currently known for secure transfer of information," and further noting that "those skilled in the art will recognize alternatives").) Encryption is commonplace on the Internet; to allow this element to impart patent eligibility would open the floodgates to any and all web-based computer and business method patent claims, something the Supreme Court's *Alice* opinion would not condone.

Claims 5, 10, and 17 require the buyer and seller agents to include "a digital certificate for authentication." Like the encryption limitation discussed above, this element recites conventional general-purpose computer technology. The '569 patent explains that digital certificates, like the encryption techniques, were commercially known and available at the time of filing. (*E.g.*, '569 patent, 3:17-18; Fig. 3 (showing VeriSign's Digital ID).) This capability relates to functions existing in virtually all computers that the patent does <u>not</u> claim to have invented and is furthermore a mathematical construct, thereby constituting yet another abstract idea to be performed by a general-purpose computer, which is plainly insufficient under § 101. Similarly, claims 6, 11, and 18 require "[software code for] a trusted token processor configured to issue and validate trusted tokens presented by the buyer and advertiser PIAs," which does not require any particular <u>physical</u> processor, but rather is directed to computer software code for creating and processing "tokens," which are themselves mathematical constructs, much like the digital

certificates. They are premised on public-key cryptography techniques admitted in the specification to be well-known and commercially available at the time. Like limitations directed to gathering, storing, and displaying information, the token extra-solution step of encrypting data, or including digital certificates or a token processor premised on common encryption technology cannot magically transform the abstract idea and mental process of the '569 patent into something that satisfies § 101. Just as a "competent draftsman could attach some form of post-solution activity to almost any mathematical formula," *Flook*, 437 U.S. at 590, patent applicants could attach generic encryption language to any abstract business concept involving communication.

In sum, the '569 patent's claims attempt to preempt the whole concept and mental process of using trusted intermediaries to broker secure exchanges of private information. Nothing in the independent or dependent claims transforms them beyond these fundamental, abstract, and mental steps. At most, the claims add references to a generic computer, generic computer components like a "database," "server," and "network," additional mental steps, and insignificant extra-solution activity such as data gathering, storing, and sending, none of which is capable of saving the claims under prevailing case law. As such, the claims fail to pass § 101's important test designed to ensure that the public retain access to the "storehouse of knowledge of all men . . . free to all men and reserved exclusively to none." *Bilski II*, 130 S. Ct. at 3221 (quotations omitted).

## V. CONCLUSION

The Supreme Court and Federal Circuit have cracked down on the scourge of patents that take an abstract concept and essentially say "computerize it." The '569 patent is one such example, claiming what people could already do, and have been doing, for years without computers or the Internet. It "add[s] nothing specific to the [abstract concept] other than what is well-understood, routine, conventional activity, previously engaged in by those" conducting commerce. *Mayo*, 132 S. Ct. at 1299. The public must be free to use this abstract concept—both

alone and on the Internet—and any patents that claim otherwise should be stricken under § 101.

For the foregoing reasons, Defendant eBay respectfully requests that the Court dismiss CYVA's Complaint (Dkt. No. 1) with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) or 12(c) and hold all claims of U.S. Patent No. 8,195,569 invalid under § 101 for failing to claim patent-eligible subject matter.

Respectfully submitted,

Dated: August 7, 2014

By: */s/ Philip Warrick*

Eric H. Findlay (TX Bar No. 00789886)
efindlay@findlaycraft.com
FINDLAY CRAFT, P.C.
6760 Old Jacksonville Hwy, Suite 101
Tyler, TX 75703
T: (903) 534-1100 F: (903) 534-1137

J. Christopher Carraway (OR Bar No. 961723)
chris.carraway@klarquist.com
Philip Warrick (OR Bar No. 116191)
philip.warrick@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204
T: (503) 595-5300 F: (503) 595-5301

*ATTORNEYS FOR DEFENDANT EBAY INC.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2014, a true and correct copy of the above and foregoing document has been served on all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3)(A).

*/s/ Philip Warrick*
Philip Warrick